# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-3794

_____

United States of America

*Plaintiff - Appellee*

v.

Ladronal S. Hamilton

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Western Division

_____

Submitted: May 1, 2019
Filed: July 9, 2019

_____

Before GRUENDER, KELLY, and GRASZ, Circuit Judges.

_____

GRASZ, Circuit Judge.

In 2012, government investigators identified California resident Ladronal Hamilton as the source of supply for multiple distributors of phencyclidine ("PCP") in Kansas City, Missouri. A grand jury eventually charged Hamilton with conspiracy to distribute one kilogram or more of PCP in violation of 21 U.S.C. §§ 841(a)(1),

(b)(1)(A), and 846. The case proceeded to trial, where the district court[1] denied Hamilton's motion for judgment of acquittal before a jury found him guilty. The district court sentenced Hamilton to a life term of imprisonment based in part on his significant criminal history and applicable enhancements for, among other things, maintaining premises for the purpose of distributing PCP, taking a leadership or organizer role in the conspiracy, and obstructing justice. Hamilton appeals, arguing there was insufficient evidence to support his conspiracy conviction and that the sentence enhancement for obstruction of justice was unwarranted. We affirm.

## I. Sufficiency of the Evidence

On appeal, Hamilton argues the evidence was insufficient for several reasons, including: (1) the government's cooperating witnesses testified against him only in exchange for their own plea deals or sentence reductions and generally lacked credibility; (2) there was no evidence Hamilton had anything more than a buyer-seller relationship with any of the alleged co-conspirators; and (3) the government failed to establish Hamilton *knew* boxes he shipped from California to Kansas City actually contained PCP.[2]

Examining the evidence in the light most favorable to the verdict, "[w]e review de novo the denial of a motion for judgment of acquittal based on the sufficiency of the evidence." *United States v. Druger*, 920 F.3d 567, 569 (8th Cir. 2019). We "also

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

[2]We note Hamilton filed a supplemental brief on May 1, 2019, focusing on the second and third reasons. We granted leave to file such a brief after Hamilton's original counsel became seriously ill shortly before the case was to be argued and then passed away soon after the case was submitted on the briefs. Despite Hamilton's shift in focus under newly appointed counsel, we address all three reasons for the sake of completeness.

accept all reasonable inferences in favor of the verdict." *Id*. We will reverse the conviction only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id*. We must uphold the jury's verdict if at least "one theory based on the evidence presented could allow for a reasonable jury to find [the defendant] guilty beyond a reasonable doubt." *Id*. Notably, "[t]his standard applies even when the conviction rests entirely on circumstantial evidence." *United States v. Tillman*, 765 F.3d 831, 833 (8th Cir. 2014) (quoting *United States v. Worman*, 622 F.3d 969, 977 (8th Cir. 2010)).

"To establish a conspiracy, the government must prove: (1) the existence of an agreement among two or more people to achieve an illegal purpose, (2) the defendant's knowledge of the agreement, and (3) that the defendant knowingly joined and participated in the agreement." *Id.* (quoting *United States v. Johnson*, 719 F.3d 660, 666 (8th Cir. 2013)). "[T]he government 'need only establish a tacit understanding between the alleged co-conspirators, which may be shown through circumstantial evidence.'" *Id*. at 834 (quoting *United States v. Jackson*, 610 F.3d 1038, 1044 (8th Cir. 2010)). The conspiracy need not be a "discrete, identifiable organizational structure," but may rely on "'a loosely knit, non-hierarchical collection of persons who engaged in a series of transactions involving distribution-quantities of [drugs] in and around' a particular city over a course of time." *United States v. Conway*, 754 F.3d 580, 587 (8th Cir. 2014) (quoting *United States v. Slagg*, 651 F.3d 832, 837, 840 (8th Cir. 2011)).

We reject Hamilton's argument that the government's witnesses were not credible because they were self-interested and dishonest. It is the jury's prerogative, not ours, to judge the credibility of witnesses. At trial, five cooperating witnesses testified against Hamilton. All five informed the jury about any plea agreements and sentence reductions they received (or hoped to receive) in their own proceedings in exchange for testifying against Hamilton. Hamilton also notes they all had multiple prior convictions and several were shown to have previously lied to government

officials. But "[w]e have repeatedly upheld jury verdicts based solely on the testimony of conspirators and cooperating witnesses, noting it is within the province of the jury to make credibility assessments." *United States v. Buckley*, 525 F.3d 629, 632 (8th Cir. 2008). "Juries are capable of evaluating the credibility of testimony given in light of the agreements each witness received from the government," *Tillman*, 765 F.3d at 834 (quoting *Conway*, 754 F.3d at 587), including "the promise of a reduced sentence." *United States v. Velazquez*, 410 F.3d 1011, 1016 (8th Cir. 2005). Therefore, we will not disturb the jury's credibility assessment of the government's witnesses here.

We also reject Hamilton's argument the government failed to prove he entered into anything more than a buyer-seller relationship with any alleged co-conspirator. Hamilton specifically argues no evidence directly linked him to any PCP distributor in Kansas City. He notes that at trial, "only one witness testified to a single transaction directly with Mr. Hamilton," while the others said they merely *believed* Hamilton was their source of PCP. Hamilton points out that law enforcement officers did not purchase PCP from him in any controlled buys, did not overhear any phone calls to or from him during numerous wiretaps of alleged co-conspirators' calls, and did not discover his phone number on the phones seized from most of the alleged co-conspirators. However, the totality of evidence easily showed he entered into more than buyer-seller relationships with other co-conspirators.

Here, the government introduced evidence Hamilton sold *distribution quantities* of PCP to (and with) various co-conspirators in Kansas City over a period of time. At trial, a Kansas City narcotics officer experienced in undercover drug deals testified PCP dealers usually purchase the drug in liquid "ounce quantities" stored in glass or plastic bottles, while *users* generally purchase one to three cigarettes dipped in PCP. Co-conspirator George Britton later testified that, on one occasion in 2011, he purchased six one-ounce jars of PCP directly from Hamilton in Kansas City — the "single transaction" for which Hamilton acknowledges there was

-4-

direct evidence. This transaction involved a distribution quantity of PCP and tended to show at least a tacit understanding Britton would resell the PCP in user-quantities, as Britton indeed said he did. *See Conway*, 754 F.3d at 588 ("[E]vidence is sufficient to show a conspiracy where drugs are purchased for resale."). Additionally, co-conspirator Reginald Thomas testified he observed Hamilton store PCP in metal cans and that he *met* with Hamilton several times in Kansas City to distribute PCP together, purchased PCP directly from Hamilton "many times" in ounce quantities, and poured PCP from metal cans into jars in Hamilton's presence for further distribution in Kansas City.[3] And co-conspirator Leelon Williams said that Hamilton, in four separate transactions in 2015, fronted him half-gallon or gallon quantities of PCP in Kansas City through Hamilton's "homegirl," after which Hamilton would call Williams directly with account numbers to which payment should be sent once the PCP was resold.[4] Therefore, because "evidence exists that large amounts of drugs were distributed over an extended period of time, including fronting transactions, [this was] ample evidence to support a conspiracy." *Id*.

Finally, we reject Hamilton's argument there was insufficient evidence he *knew* boxes he sent from California to Kansas City contained PCP. Hamilton acknowledges the government introduced evidence at trial that, from October through December of 2014, a U.S. Post Office inspector made three separate seizures of suspicious parcels sent from California addresses to the Kansas City area. The postal

---

[3]Hamilton, whose nickname was "Blac," points to Thomas's testimony admitting there was another PCP supplier known as "Black" and thus implies Thomas may have been confused about his actual source of PCP. But at trial, Thomas identified Hamilton as the supplier with whom he personally worked, allowing a reasonable jury to conclude Thomas did not confuse his suppliers.

[4]Williams was also the one co-conspirator on whose phone investigators discovered Hamilton's phone number, as Hamilton admits. Although Hamilton tries to downplay this fact by arguing Williams was an *unnamed* co-conspirator, his second superceding indictment expressly named Williams as a co-conspirator.

inspector obtained consent or warrants to search the parcels and discovered each contained gallon-sized, ribbed metal cans filled with one kilogram of liquid PCP. A forensics examiner determined that packing newspaper found in one of the parcels contained Hamilton's fingerprints and that exterior packing tape contained the prints of Hamilton's girlfriend. In addition, the postal inspector used mailing records to discover video surveillance from southern California post offices showing Hamilton mailing each parcel. Still, Hamilton argues his mere physical proximity to what was discovered to be PCP is not enough to establish his knowledge of the contents of the boxes. *See United States v. Cruz*, 285 F.3d 692, 697 (8th Cir. 2002). He notes the boxes were already sealed when he was observed on video carrying them at the post office and the forensics examiner admitted there was no way of knowing how old the newspaper fingerprints were. Again, however, we find the totality of evidence easily showed Hamilton knew what he was shipping.

This was not a matter of mere proximity. The government introduced an abundance of *circumstantial* evidence establishing Hamilton's knowledge — the usual method for doing so in this type of case. *See United States v. Ojeda*, 23 F.3d 1473, 1476 (8th Cir. 1994). In addition to the circumstantial evidence described above, at trial the narcotics officer testified that in his experience PCP dealers in Kansas City are supplied by California sources, who sometimes transfer PCP in silver, gallon-sized cans. A California police officer later testified that during a 2012 search of Hamilton's home for a state-law charge of possessing a controlled substance (cocaine), officers discovered (but did not seize) numerous empty coffee cans and lids along with cardboard boxes on Hamilton's front porch. Though Hamilton asserts coffee cans are "a far different kind of container" than the metal cans discovered in the parcels, he points to no evidence supporting this argument or precluding a reasonable jury from believing they were similar. Because we must accept all reasonable inferences in support of the verdict, *Tillman*, 765 F.3d at 833, this evidence was clearly sufficient to show Hamilton knew the parcels he sent from California to Kansas City contained cans of PCP. This evidence also corroborated

-6-

the testimony of the cooperating witnesses, and thus Hamilton's insufficient-evidence argument must fail.

## II. Obstruction of Justice Enhancement

Hamilton argues a two-point sentence enhancement for obstruction of justice was unwarranted under U.S. Sentencing Guideline ("U.S.S.G." or "Guideline") § 3C1.1. The district court applied the enhancement based on threats Hamilton allegedly directed toward cooperating witnesses, but Hamilton argues his statements were too ambiguous to be considered intimidating or threatening.

We hold that even assuming the enhancement was improper, it was harmless error. *See* Fed. R. Crim. P. 52(a). The enhancement increased Hamilton's offense level under the Guidelines from 44 to 46 points, but the maximum offense level is 43 points. *See* U.S.S.G. Ch. 5, Pt. A. The Guidelines' commentary provides that "[a]n offense level of more than 43 is to be treated as an offense level of 43." *Id*. cmt. 2. Because the Guidelines recommend a life sentence for any defendant with an offense level of 43, Hamilton's Guidelines sentence would have been a life term of imprisonment with *or without* the enhancement for obstruction of justice. *See id*. Ch. 5, Pt. A. Indeed, at sentencing the district court acknowledged Hamilton's total offense level was above the maximum and thus calculated his sentencing range based on an offense level of 43, not 46. Contrary to Hamilton's argument on appeal, then, the district court's calculation of his Guidelines sentence was correct even assuming the obstruction of justice enhancement was erroneous. *Cf. United States v. Durham*, 902 F.3d 1180, 1236–37 n.45 (10th Cir. 2018) (noting two-level enhancement for obstruction of justice "had no effect on the recommended Guidelines sentence" when defendant's offense level "already exceeded the maximum offense level of 43").

However, even if the district court miscalculated Hamilton's Guidelines sentence, we have said this, too, is harmless error "when the district court indicates

it would have alternatively imposed the same sentence even if a lower guideline range applied." *United States v. Dace*, 842 F.3d 1067, 1069 (8th Cir. 2016) (quoting *United States v. Martinez*, 821 F.3d 984, 988–89 (8th Cir. 2016)). Here the district court said that, based on the sentencing factors of 18 U.S.C. § 3553(a), it would have imposed a term of life imprisonment "regardless of the calculation of the sentencing guidelines." Accordingly, we find it "clear that the judge [also] based the sentence . . . on factors independent of the Guidelines" and thus any miscalculation of Hamilton's Guidelines sentence was harmless. *Id*. (quoting *United States v. Molina-Martinez*, 136 S. Ct. 1338, 1346–47 (2016)).

Therefore, Hamilton's challenge to his obstruction of justice enhancement also fails.

### III. Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

_____